Yes. May it please the court, my name is Stephanie Bond. I represent the appellant in this matter, Angela Ventura. I would like to reserve three minutes for rebuttal and I will keep track of my time. Agent Villa, the Border Patrol agent, testified that he had no idea who he was looking for when he approached Ms. Ventura in a neighborhood street walking along. He was basically there searching for a truck. There was no truck in the area. I have a question. Yes. Did he detain her at all? I mean she was walking. She kept walking. He didn't tell her she couldn't keep walking or go anywhere. He asked her some questions. She answered them. The case law seems to say that it's okay to ask questions. You don't have to tell people. They don't have to answer them. What's the detention? Well, Judge, I think that detention, so we agreed in the brief that when he pulls up alongside her and asks her if everything is okay or it was something to that effect, that I think is completely legal. I think he can do that. The detention began as soon as she said we're not doing anything wrong here and continued to walk away from him. And he let her? No. I mean he kept up with her, but he didn't tell her to stop walking. He didn't tell her where to go. He didn't try and stop her. Well, I agree, Judge, but it's the fact that she was not able to go about her business. She was able to go about her business. She went about her business. Well, I would disagree because she went about her business with him following her, with a show of authority, not allowing her. And then, of course, we have the issue that her brother shows up to pick her up and she's not allowed to leave with him. But that's later. That's after Dodi arrives and he claims to have known the passenger, yes, who was with her. Right. Correct. But, Judge, the issue is, there are several cases. I mean, obviously, Mendehall, I think, is the case that's probably most significant in the sense that there's a show of authority and her freedom of movement is being restrained. So, I think that he did restrain her. I was really having a hard time understanding how her movement is being restrained. She's walking, I mean, if I'm down the street and somebody's walking next to me, how is he restraining my movement? Now, he's talking to her, but that's a separate question. Right. Yeah. And he's talking to her, but he's not talking to her about anything involving the truck that he's investigating. Right. He's just basically detaining her. He's just basically harassing her at that point. There's no reason for him to even be walking alongside her. She's made it well known that she doesn't need his assistance. She doesn't want his assistance. But he is continuing in a show of authority, wearing his uniform, wearing his gun, everything else. He's continuing to follow her, walk alongside her, and not let her leave, is basically what it is. Where are we getting to not let her leave, though? She was leaving, she was walking, and he didn't tell her to stop or tell her that, and she didn't say, go away and leave me alone. So, I'm just saying, this is a very strange sort of behavior before. Well, Judge, see, I kind of disagree that she didn't say, leave me alone. I mean, as soon as she tells him, we're not doing anything wrong, and she walks away, that, I think, pretty much told him, you're bugging me, and I don't want you around me. And instead of just continuing about his business, looking for the truck, he stops his car, follows after her, catches up to her, and doesn't let her walk along like she wants to. So, let me ask you this. Let's assume that, you know, this was not consensual. Did he have reasonable suspicion in any event to stop them as an investigatory stop? Well, Judge, I think, so you could, the government argued, and I know the district court believed, that there was a common knowledge type of... Well, let me ask you this question. Yes. Did he not know that there was a search ongoing for the truck and drivers? Did he not know that? He did know that there was an ongoing search for the truck, yes. Is there a concept of collective knowledge that you can take the knowledge of all of these officers and impute it to him? Well, Judge, I think the concept of collective knowledge is an interesting one, because it doesn't seem in my research that this circuit actually agrees whether collective knowledge applies to reasonable suspicion. We know that it This court is a little, I mean, basically in Ramirez, this court had said that some circuits within this court have agreed that law enforcement working together in investigation can have a collective knowledge for reasonable suspicion. Now, Ramirez was a different... I thought the collective knowledge system usually works where some, where the person who does the stop doesn't have the knowledge, but somebody who does have the knowledge tells them to make the stop. Well, in other words, says, you know, there are some women out there, stop them. Now, he doesn't have any idea why he's stopping them, but if somebody else has the knowledge, that's okay. But that didn't happen here. There was nobody with knowledge who instigated this stop or told him to instigate the stop. Correct, and I 100 percent, and that's the reason why I don't believe that collective knowledge applies in this case, is because there wasn't anybody who directed him to do anything. They were out there looking for a truck. He wasn't even looking for women. Now, I mean, obviously, there was... Counsel, Judge Gould, if I could interject, please. Well, he knew that a truck had left the highway that was suspected of having drugs in it, right? Well, Judge, I don't know that I can agree that he knows that there's drugs. We know that Knowles, the dog who alerted on the truck... But he knows that it illegally went through the... Correct. He knows it fled from the truck checkpoint, and we know that Knowles, the dog, does detect on drugs, but he also detects on concealed humans. Okay, so if the officer was walking along and that secondary inspection had then disappeared from the highway, then why doesn't that officer have at least enough suspicion to walk along and ask questions, and if he doesn't get answers that satisfy him to detain them for more? Well, Judge, I think that in order for an officer to do that, they have to ask questions related to their investigation, and he was not. Well, that necessarily. I mean, he can make observations. I made some notes here that apparently he observed that they were sweating and breathing heavily. One was carrying a duffel bag, a little bit unusual for someone taking a walk in that area. I mean, so there was more than just questioning that was involved here. Why would that not be added to the mix to constitute reasonable suspicion? Well, Judge, the reason why the sweating and breathing heavily, I think, does not add to this mix at all is because this is Tucson in July. Everybody, it's 100 degrees, even in the evening. Carrying a duffel bag in 100-degree weather? Well, Judge, so she's waiting for her ride to show up, and that's the thing. Well, he doesn't know that. But also, there was a circumscribed area, right? In other words, the area that he found them in was the area where the truck had, as I understand it, was a fairly small area that would be defined by the fact that the truck wasn't seen after a certain point. And it was within that, the area in which a person would be if the truck... Well, that's true, but the street that she's on, Judge, does not intersect with the street that they last saw the truck. How far away was it from the border where she took off? Oh, from where she took off? Wow, Judge, you know, I... You're talking about a mile away, two miles away? Oh, much more than that. They were pursuing her for at least... Well, and I can definitely double-check and give you the exact answer, because I know there was that answer, but I'm going to estimate it's probably 10 miles from the border. But how far away was it from the place where... Pursuit at very high speed, correct? Pursuit at very high speed? At one point, yes. There was testimony that it was a high-speed pursuit at one point, then it slowed down because of traffic. Then they lost the truck because they decided, Border Patrol decided to terminate... But how far away was it from the place where the truck must have gone off the road? Well, Judge... Very close. My estimation was it was a mile. A half mile, I thought. What? You know, Judge, and I can double-check for sure, my estimation was that it was a mile. But the difference is as the crow flies versus as you walk. So as the crow flies, I believe it was a short distance. But the street that the truck was actually found on does not actually go to the street that Ms. Ventura was found on. She would have had to have gone through the desert. But she apparently did, it appears. Well, according to the jury's verdict, yes. I mean, obviously the jury found her guilty, so the jury believed that she must have tracked through the desert. I mean, honestly, I'm much more troubled by the sufficiency of the evidence questions. Well, good, because I am too. Yes. Not so much about the amount of drugs, although I understand your concern, but the connection between the marijuana on the road and this truck is awfully flimsy. It is. The only connection in the light most favorable to the government, the only connection is Knowles, the service dog, who alerts to something that he's trained to look for. But not necessarily marijuana. Exactly. And it has to be marijuana for this conviction, right? It has to be marijuana for this conviction. Agent West did not smell marijuana. We know Agent Haley said when he found the bale that the smell was overwhelming. And so you would have thought that if that bale were in that truck, that it would have been smelled by Agent West when he was speaking to the driver. Also, we have the issue. Your time's up, so I am trying to think about this. Thank you, but we'll give you a minute of rebuttal. Thank you. Good morning. May it please the Court. Jake Opraskowski on behalf of the United States. The judgment in this case should be affirmed because the District Court properly found that there was no Fourth Amendment violation and that there was sufficient evidence to sustain the jury's guilty verdict on all three counts. For the purpose of the Fourth Amendment challenges, the interactions of Agent Villa and Agent Doty with the defendant can really be split into three separate stages. The first stage being when Agent Villa first arrived on scene up until the point that Agent Doty arrived. The second stage being after Agent Doty arrived, but prior to the point that he heard confirmation from Agent West that this was the driver of that truck that flood the checkpoint. And the third being after he received that confirmation and formally placed her under arrest. But when Doty arrived, Doty knew that there were two women, for one thing. That's correct, Your Honor. And he purported to recognize one of them. Yes, Your Honor. In addition to recognizing one of them as being the passenger, he also stated that both looked familiar to the woman that he saw at the checkpoint. So in terms of reasonable suspicion at that point, it doesn't seem to be much problem. That's correct, Your Honor. We agree and would further submit that not only did he have reasonable suspicion, but at the point that he identified her as the passenger, he had probable cause to engage in or conduct an arrest at that point. However, out of an abundance of caution, he did not arrest her right then. He conducted an investigatory detention by walking up to them, telling them they were detained for further investigation, and sought further confirmation. I don't think your adversary is even arguing that there's not probable cause for the arrest. We're talking about what happened before he came on the scene, I think. Yes, Your Honor. We agree. And we would agree that on the basis of your questions earlier, it seems that you would agree that the first stage there with Agent Villa was a consensual encounter. There was no show of physical force. There was no show of authority that implied that she was not free to leave. There was no stop until there was a stop in this case. On the other hand, he can't infer anything from anything that she didn't answer, right? Because the whole point is that she has a right not to answer. That's correct. However, it was a suspicious answer considering the rest of the circumstances. So, at that point, applying the collective knowledge doctrine... If somebody had said to him, you know, there are two women walking along, stop them, that would be one thing. But nobody gave him any reason to be stopping these people. So why does he get to rely on the knowledge of other people that he didn't have any connection to? I mean, including even the indication that he's supposed to be looking for two women. Well, even if we discount what he didn't know personally, and just on what he had personally, we have... I understand. But I want to ask, are you — am I wrong about the way the collective knowledge doctrine works? Doesn't it only operate when, in fact, there is some — they don't have to communicate their knowledge, but they have to communicate that they have knowledge and do this or something. I mean, but here, he just — he had knowledge. The collective knowledge doctrine works to the degree that he — it is imputed to him to know that they, in fact, had reason to think this truck had done something illegal, even though he had no direct knowledge of that. That operates. But after that, with regard to these women, there's no collective knowledge that he had any connection to. Well, the district court found that the collective knowledge should apply. Well, I don't care what they found. I'm asking you whether it applies. Well, it should apply because of the fact that he knew that a truck had fled the checkpoint. Fine. Okay. He did know that. Right. That much is imputed as collective knowledge, yes. And knowing that a truck had fled the checkpoint, he also knew that that truck had to be between point A and point B. I understand that. But you're not trying to impute to him knowledge that there were two women in the car? No, Your Honor. All right. That's correct. Do you want to address the sufficiency question? Yes, Your Honor. A lot of the issues overlap between the sufficiency of the evidence and the Fourth Amendment because many of the factors relied upon by both Agent Villa and Agent Doty were established the sufficiency of the evidence in this case. So we have a canine alerting to the presence of contraband. That truck is later found near where these women are found without contraband in it. There's marijuana found on the highway. There's testimony establishing that this is, this Ajo Highway is a known drug trafficking corridor. This is going from a rural area to a metropolitan area. And we have two agents testifying to the fact that they have never seen marijuana thrown in the middle of a highway like this. So right after this drug dog, or. . . Something was in the truck because the dog alerted. Correct. And there, and the truck acted illegally, and there was some marijuana on the highway. That's correct. Period. So you have to get the marijuana on the highway into this truck. I mean, there could have been something else in the truck, but you have to. . . This is also not a heavily, a highway with heavy traffic. This is Ajo Highway going through rural desert. So there's testimony that it was about six to ten cars per hour. Also, as I said, testimony that these agents who are experienced agents had never seen marijuana like that right in the middle of the highway, right after a truck had pulled the checkpoint. Counsel, Judge Gould, there's a point that you didn't mention that at least I thought I read somewhere. I thought that the marijuana found on the highway was wrapped up in something that showed bruises or marks on it that indicated it had been tossed from a vehicle at high speed. Yes, Your Honor, that's correct. However, that was testified to at the motion to suppress hearing. The district court precluded us from arguing that at trial, so we're not able to argue that it looked like it was thrown from a high-speed vehicle. However, there were scuffs on it, and the jury could have reasonably concluded that those scuffs were indicative of the fact that it was thrown from a car. But there was no expert testimony or anything to that? Not to that effect. At the motion to suppress hearing, but we were precluded from arguing that at trial. Okay. Thank you. Thank you. Does the Court have any further questions about the Fourth Amendment issues or the sufficiency of the evidence? The other sufficiency issue they raise is where are you getting the distribution from? That's less troublesome to me if the marijuana on the highway can be connected to it. Because when they searched the truck, they found no evidence of marijuana, right? That's correct. Did they search the bag that she was carrying? There was testimony that they searched the bag, but there was no marijuana. To the agent's recollection, he said he didn't remember. So they somehow managed, while they're going 100 miles an hour, to throw out distribution quantities in a way that doesn't leave any residue anywhere. Well, residue that the agents could find. So there was not — I don't believe there was testimony that a dog was sent to search it again, but there was the alerts down at the checkpoint. But the agents, the people, searched the car and did not find evidence of marijuana when they found the truck. It's at least exceedingly flimsy. I mean, I've just never seen anything quite like it, where there's no direct connection between this marijuana and that truck. We would argue that, viewing the evidence in the light most favorable to the government, a reasonable jury could conclude that this truck— Beyond a reasonable doubt. Beyond a reasonable doubt. Yes, Your Honor. That this truck that had fled the checkpoint after a dog alerted to the presence of contraband— Had something in it. It had something in it. Had something in it, is later found without anything in it, and two bundles of marijuana, large bundles of marijuana, are found in the middle of the highway in this area that the chase was conducted in a way that these experienced agents have never seen before. Nobody claimed to have seen them throw anything out of the window. That's correct. No one saw it thrown out. However— And this was in the area where they were following them, or not? Yes? Yes. The agents lost sight of them around Valencia Road. Before they lost sight of them, where they found the marijuana. That's incorrect. So they passed Valencia Road, was where the marijuana was found, and that's where the agents lost sight of the vehicle. So it was after the agents lost sight of the vehicle. That's correct. After they lost sight, the marijuana was found further on down the road. To address the issue of whether this could be a distribution charge, in addition to the fact that this is a known drug-trafficking corridor, there's also the packaging. This was packaged in two different types of cellophane in a way that was indicative of both distribution and being traveled in a car. This is a testimony that this was different than packaging that would be for a backpacking case, for example. Also, just to address the weight itself, the jury found that this is 13.6 kilograms of marijuana. Although counsel makes references to a state law and was permissible with a medical marijuana card in Arizona, I would argue that a more relevant measure would be the federal sentencing guidelines, and under Chapter 2D1.1, one dose of marijuana for personal use is 0.5 grams. Now, doing some simple math here with 13.6 kilograms, that's about 27,200 individual doses. So we didn't need an expert witness to testify to the fact that this is a distribution amount, not an amount that one person would use. Okay, thank you very much. Thank you for your argument. We'll give you one minute of rebuttal. Your Honor, just to first provide the answers that you had asked that I was unable to do before. So Agent Haley followed the car for 11 miles until the pursuit was terminated. So we can estimate that the car was probably found about a mile to two miles after that. And it was three-quarters of a mile from where the vehicle was located as to where Ms. Ventura was located. So to give those answers. The only other thing I would state, Your Honor, because I do know my time is limited, I think the fact that this is a known drug corridor where this drug was found actually kind of hits both ways. I mean, obviously, you know, the government was saying, well, it's a known drug corridor that these people were traveling drugs through, we found drugs. But really, you could look at it like it's a known drug corridor, so the idea that there are drugs that are found in this area would not be very surprising, especially drugs that are found to be the amount of a backpacker. And Agent Haley did say that this is an amount consistent with what backpackers would find. When it comes to the scuff marks, as Judge Gould was discussing, it is true that the judge precluded them from speculating as to how those scuff marks got on the package. But I would also say, and one of the reasons why it was stipulated, I mean, it was precluded, is because it could have also gotten on there by a car hitting it as it drove by it. All we know is that there was some kind of impact with it, and that's what caused the scuff marks. So I do think that the sufficiency of the evidence was not there as it comes to relating the drugs to this vehicle, because there was no connection between the two of them to even get to the distribution amount. Okay, thank you very much. Thank you. Thank you both for your argument. United States v. Ventura is submitted. We'll go to United States v. Hall, and then we'll take a break.
judges: Gould, Berzon, Block